AO 91 (REV.5/85) Criminal Complaint

AUSA Andrew Hamilton    312-353-5358
AUSA Nancy Miller       312-353-4224
AUSA Meghan Morrissey   312-353-4045

**FILED**
KC
DEC 04 2006
Dec 04, 2006

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT

___NORTHERN___ DISTRICT OF ___ILLINOIS, EASTERN DIVISION___

| UNITED STATES OF AMERICA | **CRIMINAL COMPLAINT** |
|---|---|
| v. | |

JOSE ESTRADA, aka "PRIMO"
CHRIS NOVAK
ZEF RACI
CARL SZAJEK, aka "CAPONE"
ANTHONY ZIZZO, aka "MAZE"

**CASE NUMBER**

# 06CR0897

### MAGISTRATE JUDGE VALDEZ

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. Between in or about __2000 and present,__ in __Cook__ _____ County, in the __Northern__ District of __Illinois,__ and elsewhere, defendants,

conspired with others to knowingly and intentionally possess with intent to distribute and to distribute in excess of five kilograms of cocaine, a Schedule II Narcotic Drug Controlled Substance, and amounts of marijuana, a Schedule I Narcotic Drug Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1),

in violation of Title ___21___ United States Code, Section__846.__

I further state that I am a(n)__Special Agent, ATF__ and that this complaint is based on the following facts:

See Attached Affidavit.

Continued on the attached sheet and made a part hereof: __X__ Yes _____ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

__December 4, 2006__ _____ at __Chicago, Illinois__ _____
Date                              City and State

_____
Signature of Judicial Officer

__Magistrate Judge Maria Valdez__ _____
Name & Title of Judicial Officer

STATE OF ILLINOIS      )
                       )
COUNTY OF COOK         )

### AFFIDAVIT

I, Michael G. Casey, being first duly sworn on oath, depose and state as follows:

## I.      PRELIMINARY MATTERS

1.      I am a Supervisory Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), United States Department of Justice. I am currently assigned to the Chicago Field Division, and have been so assigned for more than nineteen years. I have been a Supervisory Special Agent for the last four years. Prior to that, I was a Special Agent with ATF for approximately 15 years. Prior to that, I was a police officer for nine years with the DuPage County Sheriff's Department. As a Special Agent, I have participated in investigations relating to the illegal distribution of controlled substances and other violations of the narcotics laws of the United States. I have received special training in the enforcement of laws concerning controlled substances. I have also been involved in various types of electronic surveillance and in the debriefing of defendants, witnesses, informants and others who have knowledge of the offenses involved in the illegal possession with intent to manufacture, distribute or dispense cocaine.

2.      This Affidavit is made in support of a criminal complaint charging that from in or about 2000 to the present, ANTHONY ZIZZO, aka "MAZE", CARL SZAJEK, aka "CAPONE", ZEF RACI, CHRIS NOVAK, and JOSE ESTRADA, aka

"PRIMO", conspired and agreed with Jesse Guajardo, aka "Chuy",[1] and others, including Ramon Ceballos,[2] to possess with intent to distribute and to distribute controlled substances, namely, in excess of five kilograms of cocaine and amounts of marijuana, in violation of Title 21, United States Code, Section 846.

3. As an ATF Special Agent, I have participated in a number of drug trafficking and street gang investigations. Based on my training and experience, I am familiar with the ways in which street gang members, drug traffickers and their associates conduct their gang and drug related business, including, but not limited to: their methods of distributing drugs, their use of telephones, their use of codes and code words to identify themselves and the nature of their communications, their methods of establishing and maintaining territory in which to distribute drugs, including acts of violence, and their means and methods of enforcing gang rules and regulations, including acts of violence.

4. The information contained in this Affidavit is derived from Affiant's knowledge of and prior experience in drug and gang related investigations including those at the local, state and federal levels; information obtained during interviews with numerous drug traffickers, gang members and confidential informants conducted by Affiant and other law enforcement officers; and information obtained by the Affiant from

---

[1]Guajardo was previously charged in a separate criminal complaint.

[2]Ceballos previously pled guilty to federal drug charges in the Northern District of Illinois in the matter of *United States v. Ceballos*, 05 cr 848. On October 12, 2006, Judge Holderman sentenced Ceballos to 210 months' imprisonment, to run concurrent to the 180 month term Ceballos received in the matter of *United States v. Ceballos*, 04 cr 1911, in the Western District of Texas.

other local, state and federal investigators experienced in drug and gang investigations. As a result of my participation in this investigation, my interviews with and review of reports prepared by agents in the ATF as well as other federal and local agencies and other law enforcement agents and officers, I am familiar with all aspects of this investigation as described in this Affidavit. The information contained in this Affidavit includes the results of physical surveillance; information provided by cooperating witnesses ("CWs"); agents' interviews of witnesses; agents' review of recordings of consensually recorded conversations and conversations intercepted pursuant to Court orders authorizing the interception of wire communications; and review of statements of witnesses. Since this Affidavit is being submitted for the limited purposes of establishing probable cause to arrest the individual identified above, I have not included each and every fact known to me concerning this investigation.

5. Based on the information contained in this Affidavit, I submit that there is probable cause to believe: that from in or about 2000 to the present, the above named defendants conspired and agreed to possess with intent to distribute and to distribute controlled substances, namely, in excess of five kilograms of cocaine and amounts of marijuana, in violation of Title 21, United States Code, Section 846. Specifically, each individual was involved in the Summit, Illinois drug-trafficking organization ("Summit organization"). SZAJEK, ZIZZO, and RACI all assisted Guajardo by distributing narcotics, collecting money, and securing narcotics for him. NOVAK was a customer of the Summit organization. ESTRADA supplied the Summit organization with narcotics.

3

## II.    BACKGROUND OF THE INVESTIGATION

6.    This complaint is based on an investigation into the drug trafficking and related criminal activities involving members of the Latin Kings street gang.

7.    During the course of the investigation, I and other agents and officers have used the following investigative tools to gather evidence against the above listed Latin King members: debriefing of CWs, some of whom are current or former Latin King members, regarding their knowledge of the Latin Kings and its members; physical surveillance; the execution of search warrants and seizures of contraband, including drugs and money; controlled purchases of drugs from Latin King members; electronic surveillance, including Court authorized wire taps of telephones utilized by Latin King members, and consensual recordings made of telephone calls and in person meetings between Latin Kings members and CWs; interviews of Latin King members, including some which followed their arrests for crimes related to their gang activity, interviews of witnesses; and the use of grand jury subpoenas.

8.    This investigation was initiated in June 2003 based on information derived from a cooperating witness ("CW1"), local police investigations, and arrest reports concerning gang members. These sources reveal that members of the Almighty Latin King Nation are actively involved in the sale of cocaine in neighborhoods located on the south side, southwest side and south suburbs (hereinafter "Southside") of Chicago, Illinois. Information developed to date reveals that Jesse Guajardo, aka "Chuy", is a high-ranking member of the Almighty Latin King Nation (aka "ALKN", aka "The Latin

Kings"), an ALKN member from the "South Suburban" chapter, also known as the Lenzi Latin Kings, located primarily in the area of Summit, Illinois, and a known distributor of illegal narcotics to various Sections of the ALKN in the Southside of Chicago. CW1 indicates that Guajardo is also in contact with numerous high ranking Latin King gang members throughout the City of Chicago and surrounding suburbs. This information has been substantiated in part through pen registers, electronic surveillance, consensually recorded conversations with Guajardo, and intercepted conversations including Guajardo and others.

9. The following background information is derived from Affiant's knowledge of and prior experience in Chicago area street gang investigations and violent crime, including those at the local, state and federal levels; published sources of information concerning Chicago area street gangs; information obtained during past interviews with numerous gang members and cooperating witnesses conducted by Affiant and other law enforcement officers; and information obtained by the Affiant from other investigators experienced in street gang investigations:

a. The ALKN is a violent, well-organized street gang, controlled through a hierarchical system. The ALKN gang members active within the Southside of Chicago are organized by geographic locations into Regions. Each Region is an umbrella title for the gang members who operate within that geographic area. Some ALKN Regions are so large as to dictate that the Region be subdivided into "Chapters" and under

5

each "Chapter" are "Sections", which are named by the street intersection in which the Section is located.

b.      Currently there are at least seven Regions located within Chicago and surrounding suburbs: 1) Northside Region (Humboldt Park area); 2) Chi-Town, or, Little Village, Region (26th Street area); 3) Crown Town Region (51st to 56th Street area); 4) South Suburb or Southwest Region (Summit, Chicago Heights, Bridgeview area); 5) Southeast side Region (Roseland and Pullman area); 6) Northwest Region (Waukegan, Round Lake); and Westside region. Each Region is controlled by a Regional Leader who is the highest-ranking member of the Region. Each Region also has a Regional Enforcer and Regional Treasurer.

## III.     PROBABLE CAUSE

### A.      CW-1:  Historical Information Provided by CW-1 regarding Summit Organization.

10.      CW1 has been an active member of the Southside ALKN since 1980. CW1 has provided credible, reliable, timely information to ATF since June 2003. Since that time, ATF Agents and CPD Officers have spoken to CW1 in person, or telephonically, on numerous occasions. A substantial portion of CW1's information regarding the ALKN has been corroborated by independent investigation that includes physical surveillance, interviews of ALKN street gang members in the Southside area, telephone record analysis, other Cooperating Witnesses, and CW1's participation in numerous

consensually-monitored telephone and non-telephonic conversations with Guajardo, whom CW1 knows as "Chuy."

11. CW1 agreed to cooperate with the government based on the fact that CW1 was attempting to assist a relative who was a defendant in a separate ATF investigation. CW1 was approached by ATF with the understanding that CW1's participation would be made known to the U.S. District Court Judge presiding over CW1's relative's case. CW1 then agreed to cooperate in this investigation.

12. According to CW1, Guajardo was introduced to CW1 during 2000. At the time of the introduction, CW1 knew Guajardo as a Latin King gang member and knew that Guajardo was a member of the Lenzi Latin Kings and the corona for the South Suburbs. CW1 stated that between 2000 and 2003, CW1 purchased cocaine from Guajardo approximately 10 times. During each narcotic transaction, Guajardo would "front" an ounce of cocaine to CW1. Affiant understands that the term "front" means that the cocaine was given to CW1 without having the CW1 pay for the cocaine immediately. CW1 would then sell the cocaine and then repay Guajardo. CW1 stated that Guajardo charged CW1 $800 for each ounce of cocaine. CW1 stated that in approximately Fall 2002, prior to cooperating with ATF, CW1 was present at an ALKN Nation meetings that was directed by Guajardo. CW1 stated that an Inca (the first in command of a particular section) and Cacique (the second in command of a particular section) from each Crown Town Section were in attendance and that Guajardo instructed CW1 to search each member prior to allowing them into the meeting. Additionally, cell phones and pagers

7

were not allowed. CW1 took the cell phones and pagers and placed them into a bag to hold until the meeting concluded. CW1 was not able to attend the meeting due to the fact that CW1 does not have any ranking in the ALKN.

**B.      Post-Arrest Statement of Jesse Guajardo..**

13.    On February 28, 2006, ATF agents arrested Jesse Guajardo on federal drug charges. Guajardo waived his Miranda rights and agreed to speak with agents. Guajardo admitted that he was the Inca for the Lenzi Section of the Latin Kings. Guajardo admitted receiving cocaine from, among others, JOSE ESTRADA, who he knew as "PRIMO", for approximately one and one-half years in 2003 and 2004. In all, Guajardo estimated he had received approximately 150 kilograms of cocaine from ESTRADA during that time period. ESTRADA usually "fronted" the cocaine he supplied to Guajardo. The most cocaine Guajardo received on any one occasion from ESTRADA was approximately 50 kilograms, for which Guajardo paid ESTRADA approximately $1.8 million. Guajardo admitted that CHRIS NOVAK was a customer of his who he supplied as little as one-fourth of a kilogram of cocaine and as much as one kilogram of cocaine at a time. Guajardo would "front", or provide on credit, the cocaine he supplied to NOVAK. Guajardo had other individuals who assisted him in his drug trafficking organization. ZEF RACI and CARL SJACEK would deliver kilogram quantities of cocaine on behalf of Guajardo to customers. They would also be responsible for collecting money for Guajardo. ANTHONY ZIZZO less often supplied cocaine for Guajardo. However, Guajardo fronted ZIZZO approximately 125 grams of cocaine on at

least two occasions and supplied him with ounce and ½ ounce quantities of cocaine on several occasions.

### C. Narcotics Purchases by CW1

#### 1. Narcotics Purchases from Anthony Zizzo by CW1

##### a. July 18, 2003 Purchase of one ounce of cocaine from Anthony ZIZZO.

14. On July 18, 2003, while acting in an undercover capacity, CW1 made a controlled purchase of 29 grams of powder cocaine from Latin King ANTHONY ZIZZO, aka: MAZE for $750, as further described below:

a. On July 18, 2003, agents and officers met with CW1 at a pre-arranged location to brief plans for CW1 to make a controlled purchase of one ounce of cocaine from ZIZZO. At the briefing location, CW1 was searched for guns, drugs, or money with negative results. CW1 was then equipped with electronic equipment and provided with ATF official funds in order to attempt to purchase narcotics from ZIZZO.

b. On this date, at approximately 3:45 PM, agents directed CW1 to contact ZIZZO by telephone to confirm their meeting. This call was not recorded, but was made in the presence of an ATF agent who heard CW1's portion of the call. CW1 spoke to ZIZZO. ZIZZO and CW1 agreed to meet at a Krispy Kreme restaurant parking lot on Harlem Avenue in Summit, Illinois. At approximately 4:00 PM, while under ATF surveillance, the CW1 arrived at the Krispy Kreme parking lot and was approached by ZIZZO, who was driving a White Chevrolet (later identified as Anthony Zizzo's vehicle).

Once the vehicle parked, CW1 entered the front passenger seat. A short time later (approximately 4:05 p.m.), CW1 exited the vehicle and departed the area to a pre-arranged debrief location.

        c.     At the debrief location, CW1 provided agents with approximately one ounce of suspect powder cocaine which was later submitted for laboratory testing which confirmed the presence of cocaine. CW1 was then searched for additional contraband with negative results. Agents then debriefed CW1, who related, in summary, the following: After CW1 entered the Krispy Kreme parking lot, CW1 observed what appeared to be a four door Chevrolet driving in the parking lot. CW1 then observed that the driver was ZIZZO, who parked the vehicle and CW1 entered the passenger front seat. CW1 and ZIZZO had a brief discussion. During the conversation, CW1 and ZIZZO spoke about Jesse Guajardo, aka: "Chuy." ZIZZO then told CW1 that he (ZIZZO) could call "Chuy" via his Nextel cell phone. ZIZZO told CW1 that he was using Guajardo's phone at this time. ZIZZO then contacted Guajardo on behalf of CW1. Guajardo asked CW1"is everything straight?" referring to CW1 getting the cocaine from ZIZZO. CW1 replied "yeah it's straight, I'll get up with you later". During the transaction of cocaine between ZIZZO and CW1, ZIZZO discussed the cocaine: "It would have had more rocks but I had it under the dash." CW1 believed ZIZZO to mean that his product usually has more chunks in it; however, he (ZIZZO) had to stash the cocaine underneath his dashboard. CW1 then paid ZIZZO $750 in ATF Funds. CW1 then exited the vehicle and

ZIZZO departed the area. CW1 walked to the meet spot and turned the cocaine over to ATF agents.

### b. August 5, 2003 Purchase of one ounce of cocaine from Anthony ZIZZO.

15. On August 5, 2003, while acting in an undercover capacity, CW1 made a controlled purchase of 29 grams of cocaine from ZIZZO for $850, as further described below:

a. On this date, ATF agents and officers met with CW1 at a pre-arranged location to brief plans for CW1 to make a controlled purchase of one ounce of cocaine from ZIZZO. The meeting was to take place at the Krispy Kreme restaurant parking lot on Harlem Avenue in Summit, Illinois. At the briefing location, ATF agents searched the person of CW1 for guns, drugs, or money, with negative results. CW1 was then equipped with electronic equipment and provided ATF official funds.

b. On this date, at approximately 3:00 p.m., agents directed CW1 to contact ZIZZO at 708-878-3348 to confirm the undercover meeting. CW1 telephonically contacted ZIZZO. ZIZZO did not answer; however, ZIZZO immediately called CW1 back. During the recorded call, ZIZZO instructed CW1 to travel to the Krispy Kreme parking lot and re-contact ZIZZO when he arrived. At approximately 3:22 p.m., while under ATF surveillance, CW1 arrived at the Krispy Kreme parking lot. While in the parking lot CW1 placed several calls to ZIZZO and ZIZZO made several calls back to

CW1 in an attempt to arrange the transaction. These calls took place between approximately 3:23 p.m. through 3:40 p.m. These calls were not recorded.

c.      During these calls, ZIZZO told CW1 he was attempting to obtain the cocaine from another source because Jesse Guajardo was not in possession of any cocaine. Additionally, ZIZZO told CW1 that because he was going to another cocaine source the cost would increase from $750 to $850. Based on that call, CW1 arranged to meet with ATF agents, at which time, CW1 was provided an additional $100 in ATF funds. Subsequent to receiving the additional $100 in ATF funds, CW1 contacted ZIZZO and informed him that he did have the appropriate amount of money to purchase the cocaine. ZIZZO gave instructions to CW1 to wait at the Krispy Kreme parking lot. This call was not recorded, but CW1's portion of the call was recorded from the electronic equipment CW1 was wearing.

d.      At approximately 3:55 p.m., CW1 received a call from ZIZZO, who instructed CW1 to travel westbound on 57th street until CW1 saw ZIZZO. At approximately 4:06 p.m., CW1 met with ZIZZO at his residence located at 7502 W. 57th Street, Summit, Il. A short time later (approximately 4:13 p.m.), CW1 departed the residence to a pre-arranged debrief location.

e.      At the debrief location, CW1 provided ATF agents with the narcotics evidence, which was subsequently weighed (29 grams) and field tested positive for cocaine. The narcotics were subsequently laboratory tested and found to contain cocaine. ATF agents searched CW1 for contraband, with negative results. At the debrief location,

12

ATF agents debriefed CW1, who related, in summary, the following: CW1 met ZIZZO in the alley behind his house and ultimately walked into ZIZZO's garage. CW1 advised that ZIZZO was wearing shorts with a red basketball jersey. CW1 stated that while in the garage, ZIZZO handed CW1 a plastic bag containing cocaine. ZIZZO asked the CI if he wanted to weigh the cocaine. CW1 told ZIZZO that he trusted him (ZIZZO). ZIZZO responded in part, "yeah, but I don't trust the guys I got the cocaine from." ZIZZO proceeded to enter his residence and a short time later exited his residence in possession of a scale and then re-entered the garage. ZIZZO then weighed the cocaine in the presence of CW1. The cocaine weighed 29 grams. CW1 stated that he then paid ZIZZO $850. CW1 and ZIZZO discussed the status of a rival gang called the Orchestra Ambrose. ZIZZO also told CW1 that he had the capability of obtaining firearms. CW1 stated that he then departed the area.

**3. Narcotics Purchases from Guajardo, ZIZZO, and SZAJEK by CW-1.**

16. Between September 16, 2003 and June 10, 2004, CW1 transacted two controlled narcotics purchases from Guajardo, ZIZZO, and SZAJEK while acting under the direction of ATF Agents and CPD Officers. The following are summaries of those transactions as well as summaries of the consensually monitored conversations that occurred during those transactions and prior to the actual narcotic transactions. The times given are approximate. Some of the summaries contained in this Affidavit do not include references to all the topics covered during the course of the conversations. In addition,

13

the summaries contained in this Affidavit do not necessarily include references to all statements made by the speakers on the topics that are referred to. Affiant's understanding of the conversations discussed in this Affidavit are based upon the contents and context of the conversations, his experience, information obtained in the investigation to date, conversations with other law enforcement officials and conversations with CW1.

      a.    **Purchase of approximately 28 grams of cocaine from Guajardo on October 9, 2003.**

17.    On October 9, 2003, CW1 conducted a controlled narcotics purchase with Guajardo. The following events took place leading up to the transaction and during the transaction:

      a.    On September 16, 2003, under the direction of ATF agents and at approximately 12:45 p.m., CW1 called Guajardo. The call was recorded. During this conversation, CW1 told Guajardo that CW1 was in the area (close to Guajardo's residence) and wanted to "pick up an ozilla." Affiant understands that an "ozilla" means one ounce of cocaine. Guajardo told CW1 that he was not in the area. Guajardo then instructed CW1 to contact one of his associates, ANTHONY ZIZZO, to purchase the cocaine. Guajardo then provided CW1 with ZIZZO's phone number. Due to technical difficulties, a portion of the undercover call was not recorded; however, an ATF agent with CW1 overheard all of CW1's portion of the conversation and parts of Guajardo's portion of the conversation. Affiant understands that Guajardo instructed CW1 to contact

14

one of his associates, ANTHONY ZIZZO, to purchase one ounce of cocaine. ATF did not go through with the narcotics purchase on that day.

b.       On October 9, 2003, at approximately 11:00 a.m., CW1 met with ATF Special Agents at a staging area. At this time, CW1 was fitted with a recording device which also transmitted CW1's conversations to surveillance agents. CW1 was then searched for the presence of any illegal narcotics, guns, or money. No contraband was found. CW1 was then provided $800 in ATF funds.

c.       At approximately 11:10 a.m., an ATF agent, while acting in an undercover capacity, drove CW1 to the area of Guajardo's residence, and dropped CW1 off. Surveillance units and the undercover ATF agent maintained a mobile surveillance upon CW1 and the residence of Guajardo. At approximately 11:20 a.m., CW1 was observed arriving at Guajardo's residence. At approximately 11:25 a.m. surveillance units observed CW1 depart the residence and walk eastbound to Thorton's Gas Station located in the vicinity of Southwest Highway and Harlem Avenue. Surveillance units observed CW1 arrive to the Thorton's Gas Station at 11:30 a.m.

d.       At approximately 11:35 a.m., surveillance units observed CW1 depart the Thorton's Gas Station and travel back to Guajardo's residence. At approximately 12:45 p.m., CW1 contacted the undercover ATF agent, advised that the undercover meeting was terminated, and stated that he was enroute to meet the undercover ATF agent. CW1 was observed by the undercover ATF agent and surveillance units departing Guajardo's parking lot en route to a pre-determined meet

15

location. CW1 then walked to the ATF undercover vehicle and met with the undercover ATF agent. At this time, CW1 gave the ATF undercover agent one ounce of cocaine that CW1 received from Guajardo.[3] The ATF undercover agent and other agents interviewed CW1 and later reviewed the recording of CW1's meeting with Guajardo. Based on all of that, the Affiant understands the following occurred:

1)      Upon arrival at Guajardo's apartment, CW1 was told by an unidentified female that Guajardo was not home. CW1 was allowed to use the phone to call Guajardo. During the phone call, CW1 stated in part, "You think you could pick up something before you get here, for me? An ozilla, an ozilla." Affiant understands that an "ozilla" means an ounce of cocaine.

2)      A short time later, Guajardo arrived at the apartment. CW1 and Guajardo met in the hall in front of Guajardo's apartment and then went into Guajardo's apartment. During the meeting, Guajardo asked CW1, "What you need?" CW1 stated in part, "I need a whole ozilla [ounce of cocaine]. I got the loochie on me." Affiant understands "loochie" to mean money. Guajardo then told CW1, "wait here." Guajardo then entered the apartment across from Guajardo's apartment. Guajardo then reappeared and met with CW1. During the meeting, CW1 said, "How much?" Guajardo said, "Just 8 bro." Affiant understands "8" to mean $800. CW1 then paid Guajardo $800 in ATF funds, received an ounce of cocaine from Guajardo, and departed.

---

[3]      DEA laboratory analysis indicated that the substance tested positive as cocaine and weighed 26.8 grams.

16

**b.** **Purchase of Approximately 250 grams of cocaine from Guajardo and SZAJEK on June 10, 2004.**

18. On June 10, 2004, CW1 conducted a second controlled narcotics purchase with Guajardo. The following events took place leading up to the transaction and during the transaction:

a. On November 20, 2003, at approximately 12:00 p.m., CW1 met with ATF Special Agents at a staging area. At this time, CW1 was fitted with a recording device and a transmitter. CW1 was then searched for the presence of any illegal narcotics, guns, or money. No contraband was found.

b. At approximately 1:00 p.m., while acting in an undercover capacity, an ATF Agent drove CW1 to the vicinity of Southwest Highway and Harlem Avenue. Surveillance units maintained a mobile surveillance upon CW1 and the residence of Guajardo. At approximately 1:10 p.m., CW1 was observed arriving at Guajardo's residence. During the undercover meeting, Guajardo told CW1 that a ¼ kilogram of cocaine would cost no more than $5,500. The undercover meeting was then terminated. At approximately 1:18 p.m., surveillance units observed CW1 depart the residence and travel eastbound to a pre-determined meet location.

c. On March 16, 2004, at approximately 11:00 a.m., CW1 met with ATF Special Agents at a staging area. At this time, CW1 was fitted with a recording and video device and transmitter. CW1 was then searched for the presence of any illegal narcotics, guns, or money. No illegal contraband was found.

17

d.       At approximately 11:28 a.m., while acting in an undercover capacity, an ATF undercover agent drove CW1 to the vicinity of Southwest Highway and Harlem Avenue.   Surveillance units maintained a mobile surveillance upon CW1 and the residence of Guajardo.

e.       At approximately 12:02 p.m., CW1 was observed arriving at Guajardo's residence.  Based upon ATF agents' later debriefing of CW1 and a review of the recording of CW1's meeting with Guajardo, Affiant understands that during the undercover meeting, CW1 told Guajardo that CW1 was attempting to contact him (Guajardo) via his cellular telephone in order to purchase the previously discussed ¼ kilogram of cocaine; however, Guajardo's cellular telephone was not in service. According to CW1, Guajardo told CW1 his new cellular telephone number.  According to CW1, he wrote the new number on a piece of paper.  After the undercover meeting was terminated, CW1 handed ATF agents a slip of paper with the phone number.

f.       At approximately 12:15 p.m., surveillance units observed a Black Chevrolet Caprice Sedan depart Guajardo's residence with the CW1 and two unidentified individuals in it.  The Caprice traveled to a Wal-Mart parking lot at which time CW1 exited the vehicle.  Surveillance units then observed the Caprice Sedan exit the area. CW1 informed ATF agents that two Latin King gang members drove him to the Wal-Mart.

g.       At approximately 12:25 p.m., CW1 met with an undercover ATF agent and entered the ATF undercover vehicle.  At this time, the recording device was

18

deactivated. The undercover ATF agent and CW1 then traveled to a pre-determined staging area. While at the staging area, CW1's person was searched for the presence of illegal narcotics, guns, or money. No illegal contraband was found.

h.    On June 10, 2004, at approximately 7:36 p.m., CW1, in the presence of ATF Agents, called Guajardo. During this conversation, which was recorded, CW1 asked Guajardo "if we could do that business today"? Affiant understands that CW1 was asking about whether Guajardo could sell narcotics to CW1 when CW1 asked whether they could do "business" that day. Guajardo asked CW1 "when and where?" CW1 told Guajardo that whenever and wherever he wanted to, because CW1 was ready. Guajardo asked CW1 what was CW1's location and further asked how CW1 was going to get back to CW1's location. CW1 told Guajardo that CW1 was going to bring a back pack and then take the bus back to CW1's location. Guajardo instructed CW1 to meet at JJ Peppers, a convenience store located at 6034 Archer Road, Summit, Illinois.

i.    At approximately 8:15 p.m., CW1 and ATF agents met at a staging area. At this time, CW1 was fitted with a recording and video device and transmitter. CW1 was then searched for the presence of any illegal narcotics, guns, or money. No illegal contraband was found. ATF agents then provided CW1 $5,000 in ATF funds.

j.    At approximately 8:55 p.m., an undercover ATF agent drove CW1 to JJ Peppers and dropped off CW1 at the store parking lot. The undercover ATF agent and other surveillance units maintained a mobile surveillance upon CW1.

19

k.      At approximately 9:00 p.m., surveillance units observed a Black Cadillac Escalade registered to an associate of Guajardo's arrive at the JJ Peppers parking lot.   Surveillance units observed CW1 enter the rear passenger seat of the Cadillac. Surveillance observed the Cadillac exit the JJ Peppers parking lot and proceed southbound on Archer Avenue.   Surveillance then observed the Cadillac enter Sterling Estate mobile home community, to which Guajardo had moved from his residence in Worth, Illinois.   Due to the area and counter surveillance performed by the Latin King organization, surveillance units did not enter Sterling Estate.

l.      At approximately 10:15 p.m., CW1 contacted the undercover ATF agent and advised that the undercover meeting was terminated.  CW1 then met with ATF agents at a pre-determined meet location and entered the ATF vehicle.  At this time, CW1 gave the ATF agent a ¼ kilogram of cocaine that he received from Guajardo and another Latin King gang member, CARL SZAJEK.[4]  Additionally, the recording device was deactivated.  While at the staging area, CW1's person was searched for the presence of illegal contraband.  No illegal contraband was found.  ATF agents then met with and interviewed CW1.  Based on that interview and the Affiant's review of the audio and video recording of the meeting, Affiant understands that the following occurred:

1)      CW1 was picked up by SZAJEK and Guajardo in the Cadillac. They proceeded to take CW1 to Guajardo's trailer home in Sterling Estate.

---

[4]
        DEA laboratory analysis confirmed that the substance was cocaine and weighed 234.8 grams.

CW1 stated that after CW1 counted out the $5000 in ATF funds, Guajardo asked CW1 if he was "wired". CW1 replied, "No." Affiant understands Guajardo's inquiry about "wired" to mean that Guajardo was inquiring about whether CW1 was wearing a police wire that transmitted communication. CW1 was wearing an electronic device that transmitted communication. CW1 stated that Guajardo then took a small item and waived it up and down CW1. Affiant understands that the device Guajardo was utilizing is referred to as an RF Detector. While Guajardo waved the device up and down CW1's body, the device alerted to a piece of equipment that CW1 was wearing. Guajardo took possession of the device and questioned CW1. CW1 told Guajardo that the device belonged to his employer. CW1 has told Guajardo and other Latin King gang members previously that his employer is affiliated with organized crime in order to provide a cover for his activities. Guajardo then gave the device to SZAJEK and instructed SZAJEK to take the device outside. SZAJEK took possession of the device and placed it into the Cadillac.

2)     CW1 stated that Guajardo and SZAJEK then counted the $5,000 in ATF funds. CW1 stated that Guajardo and SZAJEK then went into a back room carrying a large plastic bag and a scale. A short time later, SZAJEK and Guajardo exited the room. SZAJEK and CW1 then exited Guajardo's trailer home and re-entered the Cadillac. Guajardo remained at his residence. SZAJEK then drove the Cadillac a short distance to another trailer home located in Sterling Estate and exited the Cadillac. CW1 observed SZAJEK then walk to the rear of the trailer for a short period of time.

21

CW1 then observed SZAJEK re-appear from behind the trailer home and walk toward the Cadillac. CW1 stated that SZAJEK then re-entered the Cadillac and gave CW1 the ¼ kilogram of cocaine. CW1 believes it was during this time that SZAJEK took approximately 15 grams of the cocaine prior to giving it to CW1. CW1 stated that Guajardo and SZAJEK maintained possession of the device that CW1 had worn.

m. On June 16, 2004, at approximately 2:35 p.m., while acting in an undercover capacity, an undercover ATF agent made a recorded call to Guajardo and left a message on Guajardo's voice mail. The undercover ATF agent stated that he was CW1's employer and that he was calling to make arrangements between CW1 and Guajardo to return the items that Guajardo still had in his possession, namely approximately 15 grams of cocaine that had been shorted and the electronic device. The pen register for the phone revealed that someone checked the messages for the phone soon after the undercover ATF agent left a message.

n. At approximately 2:40 p.m., Guajardo called the ATF undercover phone and spoke to CW1. Guajardo blocked his phone number, rendering ATF's undercover phone unable to pick up the phone number on caller identification. During the conversation, which was recorded, Guajardo stated in part, "what the fuck is your problem giving this nigger my mother fucking phone number nigger?" CW1 told Guajardo that his employer got the phone number from CW1's phone book. Guajardo stated in part, "You gonna let any mother fucker do what they want to do with your phone?" Guajardo then stated in part, "consider this your one and only warning, Okay?

22

If I see you, if they catch you, you're not going to be the same way ever again. Lose my number, forget that you know me, I know who you are and I know." CW1 has had no further contact with Guajardo.

**D.      Title III Intercepted Discussions Involving Guajardo and Others**

19.      On July 27, 2004, Acting Chief Judge James Holderman signed an order authorizing the interception of wire communications to and from Target Phone 1, a phone used by Guajardo.  Interception began on July 30, 2004.  On August 5, 2004, active interception of calls on Target Phone 1 ceased because the phone was placed on standby status and not used.  On September 3, 2004, Acting Chief Judge James Holderman signed an order authorizing the interception of wire communications to and from (708) 785-9165 ("Target Phone 3").  Interception began on September 8, 2004, and continued until September 20, 2004.  On October 6, 2004, Chief Judge Charles Kocoras signed an order authorizing the interception of wire communications to and from (708) 257-8488 ("Target Phone 4").  Interception began on October 7, 2004, and continued until November 5, 2004.  On January 21, 2005, Chief Judge Kocoras signed an order authorizing the continued interception of wire communications to and from Target Phone 4.  Interception began on January 21, 2005, and continued until February 19, 2005. Finally, on March 4, 2005, and continuing until April 3, 2005, Chief Judge Kocoras signed an order authorizing the continued interception of wire communications to and from Target Phone 4. The following are some of the pertinent conversations intercepted from the respective Target Phones with interpretation of the conversations. The interpretations are based on

23

my training and experience, the calls themselves, and debriefings of cooperating witnesses, including CW4:

###    1.    Calls Involving CHRIS NOVAK, SZAJEK and Guajardo regarding Narcotics and a Gun.

20.    On August 2, 2004, at approximately 5:07 p.m., Target Phone 1 received an incoming call from 773-550-3008, subscribed to Christopher NOVAK, who has been identified by CPD officers and a cooperating witness ("CW4")5 as a long-time member of the Almighty Latin King Nation street gang. NOVAK told Guajardo that instead of "the one" Guajardo was "supposed to give tonight," he wanted "another one, so it would be a whole one." Guajardo said he would "try." NOVAK asked Guajardo to let him know because "they" were coming in at "7:30." Guajardo told NOVAK that he would let NOVAK know. I understand that when NOVAK referred to "the one", "another one," and a "whole one," NOVAK was describing a kilogram quantity of cocaine that he wished to obtain from Guajardo.

21.    On August 2, 2004, at approximately 9:59 p.m., Target Phone 1 received an incoming call from 773-550-3008. NOVAK said, "Hey Chu [Jesse Guajardo, aka Chuy]." Guajardo told NOVAK that he picked up "a little more than [he] wanted" and would meet with NOVAK in 15 minutes. I understand that Guajardo was telling NOVAK that he had obtained a quantity of narcotics for NOVAK that was more than

---

5CW4 has been cooperating with the investigation since his/her arrest on federal drug charges in early 2006. CW4 was a leading member of the Summit organization. CW4 is cooperating in hopes of receiving consideration on any sentence he/she receives. CW4 has proven reliable and his/her information has been corroborated through other cooperating witnesses, consensually recorded telephone calls and meetings, and controlled purchases of narcotics and firearms.

NOVAK had ordered and would meet with NOVAK in approximately 15 minutes in order to deliver the narcotics to NOVAK.

22.     On August 2, 2004, at approximately 11:09 p.m., Target Phone 1 called 773-550-3008 and Guajardo spoke with NOVAK, who complained that Guajardo had not called him to let him know that he was not going to be able to meet. NOVAK said that this was his "good guy." Guajardo responded that he would bring "double what I was supposed to bring." Guajardo said that he would be right over. I understand that NOVAK was complaining to Guajardo about failing to meet with NOVAK in order to supply NOVAK with narcotics. I understand further that Guajardo agreed to bring NOVAK additional narcotics.

23.     On August 2, 2004, at approximately 11:23 p.m., Target Phone 1 received an incoming call from 773-550-3008. Guajardo told NOVAK that Guajardo was on NOVAK's "block right now." Guajardo told NOVAK that he did not want "to have it [narcotics] in my car." NOVAK told Guajardo that he had to get up early for the "hospital" the next morning.

24.     On August 3, 2004, at approximately 4:47 p.m., Guajardo had a conversation with NOVAK on Target Phone 1. NOVAK asked Guajardo how long before he would be "moving." NOVAK said he wanted to do "it [obtain drugs from Guajardo] now" because NOVAK was sick and had a "root canal today." Guajardo told NOVAK he would put his shoes on, put "it [drugs]" in his bag, and meet with NOVAK. According to CW4, Guajardo subsequently supplied NOVAK with a kilogram of cocaine.

25

25. On October 16, 2004, at approximately 4:42 p.m., Target Phone 4, Guajardo received an incoming call from telephone number 773-550-3008. NOVAK spoke to Carl SZAJEK, who was utilizing Target Phone 4. During the call, NOVAK, a convicted felon,6 asked SZAJEK, a convicted felon,7 where Guajardo was because he (NOVAK) had a guy who wanted to sell a ".45" for approximately "$425.00." NOVAK told SZAJEK that he would call back around 6:00 p.m. I understand that when NOVAK refers to a ".45," he means a .45 caliber firearm. As the conversation continued, NOVAK said, "fuckin' its beautiful, I mean pearl handles bro." SZAJEK asked if he had two and NOVAK responded, "He's got one, this, I mean this fucker here is gorgeous, fucking gold handle, I mean pearl handles with gold trigger." NOVAK then told SZAJEK that the owner of the gun was standing right next to him. NOVAK then was heard talking to the owner of the gun, "You won't take less than four twenty five." The unidentified male then told NOVAK, "without the shells, I'll take four." SZAJEK then stated, "Take 350

---

6

NOVAK has at least three convictions. On August 5, 1983, in Cook County, Illinois, NOVAK was sentenced to 32 years' imprisonment for murder and 12 years' imprisonment for armed violence. On January 11, 1977, NOVAK was sentenced to one year probation for unlawful use of a weapon. On March 11, 1977, NOVAK was sentenced to one to three years' imprisonment for armed robbery and one to three years' imprisonment for aggravated battery.

7

. On June 19, 1990, in Cook County, Illinois, SZAJEK was convicted of manufacture/delivery of a controlled substance and sentenced to three years' probation. On July 5, 1995, in Cook County, Illinois, SZAJEK was convicted of Illinois Vehicle Code violations and sentenced to 400 days' imprisonment. On June 7, 1999, in Udvale County, Texas, SZAJEK was convicted of Illegal Expense/Investment of Drug Money and sentenced to five years' imprisonment.

bro, I, I, I got 350 right now bro." NOVAK then said to the unidentified male, "He said he got 350 right now." NOVAK then said to SZAJEK, that "he won't go bro."

26. On October 16, 2004, at approximately 5:17 p.m., on Target Phone 4, SZAJEK called NOVAK. During the conversation, SZAJEK told NOVAK, "Hey, bro, we'll take it bro. You gonna bring it by, we gonna pick it up or what?" NOVAK replied, "Yeah, you're probably going to have to pick it up because I'm at home now and old boy, I'm going to have to call him to meet him... " After SZAJEK told NOVAK that he was going to get something to eat, SZAJEK asked NOVAK, "this way it gives him time to come to your crib?" NOVAK replied, " . . .no, I won't let him come here. I don't you know, not to many people, he's cool, but I was at my brother's house. He knows where he is. And this guy comes from out of town. . ."

27. On October 16, 2004, at approximately 6:08 p.m., Target Phone 4 placed a call to 773-550-3008. The voice of SZAJEK was recognized as the user of Target Phone 4 on this phone call and is heard speaking to NOVAK. NOVAK told SZAJEK that his "guy" still hadn't called him. SZAJEK then answered the call waiting on Target Phone 4 and had a conversation with Guajardo. SZAJEK told Guajardo that the deal was "for sure." Guajardo asked whether he (SZAJEK) was going to "bring it." SZAJEK told Guajardo that they would have to pick it up and that it would be better that way. Subsequently, according to CW4, SZAJEK, Guajardo, and NOVAK met in order for NOVAK to show SZAJEK and Guajardo the firearm. SZAJEK and Guajardo ultimately did not purchase the gun.

27

### 2. Calls Involving SZAJEK Regarding Narcotics.

28.     On October 7, 2004, at approximately 3:01 p.m., Target Phone 4 received an incoming call from (815) 212-5952.  Carl SZAJEK answered Target Phone 4 and asked Individual A, who, according to CW4 was a drug customer of the Summit organization, "what's up with this nigger?"  Individual A responded, "He doesn't want to pay nothing for these. He has to see it and if he likes it, he buys it."  SZAJEK asked Individual A where the deal was going to take place.  Individual A replied, "we're gonna go to his house and show it to him."  SZAJEK then asked how long it was going to take to get the money after he "looks at it".  SZAJEK stated that he did not want to wait three hours like he did last time.  SZAJEK further stated that he would "show it" to him, let him "do his thing with the little piece", and then wait an hour.  Individual A responded, "we will wait for his call and then pick up the money."  SZAJEK then told Individual A that he would do it.  Individual A instructed SZAJEK to call him when he was close by.  I understand that SZAJEK was arranging a narcotics sale with Individual A.  I further understand after reviewing the call with CW4 that SZAJEK was willing to allow Individual A to take a small sample to test for quality prior to purchasing the narcotics.

29.     On October 7, 2004, at approximately 7:56 p.m., on Target Phone 4, Guajardo placed a call to phone number 815-212-5952.  Individual A answered the phone.  Guajardo asked to speak to SZAJEK, who then came onto the line.  During the call, SZAJEK told Guajardo that "the guy he met with didn't take it." SZAJEK further told Guajardo that "he wanted it for 22 or 25 and I wasn't going to do it for less than 27."

28

SZAJEK added, "I knew it was going to go down like that." I understand that SZAJEK was telling Guajardo that he did not sell a particular quantity of narcotics because the customer only wanted to pay "22" (meaning, I believe, $2,200) or "25" (meaning, I believe, $2,500 and SZAJEK was not going to sell the narcotics for less than "27" (meaning, I believe, $2,700).

### 3. Calls Involving Guajardo and ZEF RACI with Individual B Regarding Narcotics.

30. On October 14, 2004, at approximately 4:04 p.m., on Target Phone 4, Guajardo placed a call and spoke with Individual B. During the call, Individual B told Guajardo, "you holler at your guy, man. Just tell that the shit was short like 9 grams and shit." I understand that Individual B was complaining to Guajardo that he purchased narcotics from Guajardo and Individual B was shorted by 9 grams. Guajardo then told Individual B, "don't worry, I'll take care of it. It's cool. Don't trip."

31. On October 25, 2004, at approximately 3:00 p.m., on Target Phone 4, Guajardo placed an outgoing call to 708-269-8252. Guajardo talked to Individual B about "sucha" (the Spanish term for "narcotics"). Guajardo told Individual B that he (Guajardo) was going to have one of his guys "check it out." Guajardo further told Individual B that he was going to check out some different "shit" (drugs) and would call him back.

32. On October 25, 2004, at approximately 4:47 p.m., on Target Phone 4, Guajardo received an incoming call from 708-269-8252 and spoke to Individual B.

Guajardo told Individual B that he would be ready "tomorrow" to "do business" and that he checked out "the product (drugs)" and it was "good."

33. On October 30, 2004, at approximately 2:05 p.m., on Target Phone 4, Guajardo received an incoming call from phone number 708-250-0874, and spoke to Individual B. Guajardo told Individual B that the only one he could find was "my boy" who would be getting off of work at 5:15. Guajardo stated that he could do "it" at 5:30. Guajardo further stated that it was "worth the wait. It's fire." I understand that Guajardo and Individual B were planning to meet to consummate a drug deal. According to CW4, "fire" refers to hydro, a type of marijuana which Guajardo supplied to "Little Man."

34. On October 30, 2004, at approximately 2:33 p.m., on Target Phone 4, Guajardo called 708-250-0874, and spoke again to Individual B. Guajardo asked Individual B whether he could come right now because "he'll do it right now." Guajardo then asked, "can they do it or what?" Individual B replied that he would let him know and agreed to call Guajardo back. I understand that Guajardo and Individual B were discussing plans to meet to consummate the drug deal they discussed in the telephone call referred to above.

35. On October 30, 2004, at approximately 2:38 p.m., on Target Phone 4, Guajardo placed a call to 708-250-0874, and spoke to Individual B, who told Guajardo, "I'm gonna go that way, man." Guajardo replied that he would be waiting for him. Guajardo further stated, "I'm gonna meet you at the same place." I understand that

30

Individual B and Guajardo made arrangements to meet so that Guajardo could sell Individual B an unknown quantity of hydro marijuana.

36.     On November 1, 2004, at approximately 8:24 p.m., Target Phone 4 placed an outgoing call to phone number 708-250-0874 and spoke with Individual B. Guajardo told Individual B that they were on their way. Guajardo told Individual B that "this shit (narcotics) is fire" and that Guajardo knew that he was going to be happy. Guajardo further told Individual B that he would bring him the "whole thing" if he wanted it. Guajardo then gave Target Phone 4 to another individual, ZEF RACI, who told Individual B that this was "gravy" and that "it" was "better than the last shit." RACI told the Individual B that last time he gave "it" away for dirt cheap and smoked the rest and that "this stuff" was much better. Guajardo returned to the phone and talked to the Individual B about what size or amount he wanted. RACI stated that he just "re-upped" (got more drugs) from somebody.

37.     On November 1, 2004, at approximately 8:29 p.m., Target Phone 4 placed an outgoing call to phone number 708-250-0874, used by Individual B. ZEF RACI, utilizing Target Phone 4, asked Individual B if Individual B wanted them to run him "that." Individual B replied, "yes." RACI then stated that they would be on their way in twenty minutes. According to CW4, the Summit organization then supplied Individual B with a quantity of hydro marijuana.

**4.  Calls Involving RACI, SJAZEK, JOSE ESTRADA, Guajardo, and Ramon Ceballos Regarding a Drug Debt Owed by Ceballos to Guajardo.**

38.  Through conversations intercepted on Target Phone 4, and discussions with CW4, it appears that Ramon Ceballos owed Guajardo a substantial sum of money as a result of prior dealings between the two.  On February 14, 2005, ATF agents stopped Guajardo and others as they were driving in a vehicle away from a meeting with Ramon Ceballos.  At the time of the stop, ATF agents had reason to believe that Guajardo had received a portion of the proceeds from a prior narcotics related debt owed by Ceballos since Guajardo had been intercepted in conversations that day indicating that he was going to Ceballos' home.  ATF Agents further observed the vehicle in which Guajardo was a passenger outside of Ceballos' home prior to the stop.  When ATF agents approached the vehicle, they observed a large sum of money on a bench of the vehicle.  Law enforcement personnel retrieved the currency from Guajardo's vehicle.  Intercepted communications concerning those events are as follows: CW4 later confirmed that Guajardo had received $21,000 from Ceballos prior to the stop.

a.  On January 21, 2005, at approximately 7:28 p.m., on Target Phone 4, Guajardo called 708-768-6948, and spoke with Individual C, an associate of Ceballos.  Guajardo said to Individual C, "You could have told me on the phone not until Wednesday."  Individual C told Guajardo that he did not want to tell Guajardo "on the phone."  Guajardo then expressed disappointment, because Individual C had "first said Tuesday and now you are telling me Wednesday."  Guajardo then told Individual C to

"listen carefully. . . . when you talk to [Ceballos] you tell him that I am pissed . . . because he gave me his fuckin word." Guajardo then told Individual C to have Ceballos call him. I understand that Guajardo is expressing his frustration with Individual C because Individual C and Ceballos had promised they would deliver Guajardo money on Tuesday and they were now telling him the delivery would be Wednesday.

b.  On January 21, 2005, at approximately 8:44 p.m., on Target Phone 4, Guajardo received an incoming call from RACI at 708-299-7946. They discussed Individual C not having "money" for Guajardo, who told RACI about what he told Individual C in the previous phone call. It is my understanding that Guajardo and RACI are discussing an outstanding narcotics related debt.

c.  On January 25, 2005, at approximately 8:31 p.m., on Target Phone 4, Guajardo received an incoming call from 708-768-6948, the phone number used by Individual C. Guajardo asked Individual C why he was "playin' games." Guajardo and Individual C agreed to meet. Guajardo then told Individual C that he was sorry to put Individual C "in the middle of this." Guajardo then reminded Individual C that "this" had been "going on for two months" and that Guajardo did not want "to smoke [shoot] a nigga or get smoked [shot] over a lousy 100 dollars." Guajardo then said that they were going to have "a real big problem come Friday" if Guajardo did not have his "stuff." I understand that Guajardo and Ceballos (and, therefore, Individual C) were having a dispute over money which had lasted for some period of time and Guajardo wanted the dispute resolved by Friday.

d.      On January 27, 2005, at approximately 9:42 p.m., Target Phone 4 called 708-768-6948, the phone number used by Individual C, who asked SZAJEK if he wanted to "wait til the morning." Individual C then asked whether SZAJEK was going to come to the house to "pick it up." Guajardo, in the background, was then heard saying, "he'll be there in 10 minutes." I understand that Individual C had something to give to Guajardo through his associate, SZAJEK, and wanted to know whether it could wait until the next morning. Guajardo apparently wanted the item immediately, because he directed his associate to go to Individual C's immediately.

e.      On February 3, 2005, at approximately 1:37 p.m., Target Phone 4 received a call from 773-851-1593, subscribed to Ceballos. Guajardo told Ceballos that he had told him to meet by the gas station and Ceballos responded that he was not there yet. Ceballos then told Guajardo that instead of rushing Guajardo, they should meet at "5 or 6 o'clock." Guajardo responded, "that's what you said yesterday."

f.      On February 5, 2005, at approximately 1:47 p.m., Target Phone 4 received a call from 773-851-1593, subscribed to Ceballos. Ceballos told Guajardo that Ceballos was going to call him and that they needed to meet today.

g.      Later that day, at approximately 6:06 p.m., undercover ATF agents and other law enforcement officers performed a traffic stop of Individual C and another individual. During a surveillance performed in an area close to the residence of Guajardo, ATF agents observed an Infiniti sport utility vehicle driving on the Frontage Road leading to Guajardo's residence. ATF agents had previously observed the same vehicle being

34

driven by Ceballos and Individual C during the last several days, which corresponded to information received during monitored telephone conversations between Ceballos and Guajardo. ATF undercover agents performed a vehicle stop. Agents performed a pat-down search of both Individual C and the other individual, who was then asked if he would agree to empty his two front pants pockets. The individual agreed. He produced two bundled packs of money held together by a rubber band. The money totaled $999. ATF agents took the money into custody and inventoried it as evidence. Individual C and the individual were then allowed to depart the scene.

h. On February 5, 2005, at approximately 6:40 p.m., Target Phone 4 received an incoming call from 708-415-6099. Guajardo had a conversation with ZEF RACI. Guajardo told RACI to "be careful," because "they [the police]" were "trying to get [them]." Guajardo told RACI that "they [the police]" "went in his phone" so Guajardo was going to "disconnect" his phone the next day. I understand that Guajardo was telling RACI that he would stop using Target Phone 4 the next day because law enforcement had checked the cell phone of Individual C when he was stopped on February 5, 2005.

i. On February 10, 2005, at approximately 11:40 a.m., Guajardo had a conversation on Target Phone 4 with ZEF RACI, who asked Guajardo whether he had "heard from the guy [Ceballos] yet." Guajardo said, "no." Guajardo said that he had spoken with "the guy last night" but he would not answer Guajardo's calls since "last night." RACI then told Guajardo how he should "deal with [Ceballos]" and "the money"

35

that Ceballos owed. RACI told Guajardo that "[Ceballos] does not think [we'd] do nothing to his ass." RACI continued, "When his fuckin' sister don't come home from work tonight . . . " I understand that Guajardo and RACI were discussing a debt owed to Guajardo by Ceballos and Ceballos's continued failure to pay the debt. I understand further that RACI proposed kidnapping Ceballos's sister in order to force him to pay the debt.

j.      On February 10, 2005, at approximately 6:21 p.m., Target Phone 4 received a call from Ceballos at an unknown number. Ceballos told Guajardo that he had missed his flight and that he would fly out "tomorrow". Guajardo told Ceballos that it is "very, very, very important that [he gets] back tomorrow." Guajardo and Ceballos agreed to talk when Ceballos arrived in Chicago.

k.      On February 13, 2005, at approximately 10:05 p.m., Target Phone 4 received a call from 708-768-6948, and Ceballos spoke with Guajardo. They made plans to meet. Ceballos told Guajardo that he wanted to meet with Guajardo, but not with "these people with [me]." Ceballos then told Guajardo that if Ceballos was "stalling, then there is a reason" because Ceballos would "never just be a jag off." They agreed to speak again in twenty or thirty minutes.

l.      On February 14, 2005, at approximately 3:25 p.m., on Target Phone 4, Guajardo had a conversation with JOSE ESTRADA, aka "PRIMO", and told him that he was on his way to the "fuckin' guy [Ceballos] right now." Guajardo told ESTRADA that he would call after he was done.

36

m.     On February 14, 2005, at approximately 4:39 p.m., Target Phone 4 called 630-886-0522 and Guajardo had a conversation with ESTRADA. Guajardo told ESTRADA that he was "five minutes from [Ceballos]'s crib." Guajardo and ESTRADA agreed to meet at approximately 5:30 p.m.

n.     On February 14, 2005, at approximately 4:45 p.m., ATF agents conducting surveillance of Guajardo observed a vehicle in which Guajardo had been seen approximately ten minutes before parked at Ceballos's house. A few minutes later, ATF agents observed the vehicle driving away from Ceballos's home.

o.     On February 14, 2005, at approximately 4:58 p.m., Target Phone 4 called 630-886-0522 and Guajardo spoke with ESTRADA. Guajardo told ESTRADA that he had "just picked up ah one of my cousins' . . . birthday card that's 21." Guajardo added, "But I got my other cousin that I was supposed to go to lunch with and her mother's best friend just turned thirty but I got the birthday card right now, I'm gonna sign it and drop it off to her right now." Guajardo then said, "I'm gonna go straight to the other birthday card cause she's older you know what I mean?" ESTRADA said, "okay, okay." Guajardo and ESTRADA agreed to meet in thirty minutes. I understand, based in part on the events described in subparagraph w below and based in part on information provided by CW4, that Guajardo was telling ESTRADA that he had just received from Ceballos ("just picked up ah one of my cousins' . . . birthday card") approximately $21,000 (the discussion of a 21 year old birthday card).

37

p.  On February 14, 2005, at approximately 5:16 p.m., ATF agents, having reason to believe that Guajardo had received a portion of the proceeds from the outstanding narcotics related debt owed by Ceballos, instituted a traffic stop of the vehicle in an area of Justice, Illinois close to Guajardo's home. Guajardo's brother was driving the vehicle. Guajardo was a passenger in the vehicle. RACI was also in the vehicle. Agents searched the vehicle and located approximately $9,000, which RACI counted out in front of the agents. RACI told agents that the money was given to him from his father subsequent to receiving a home equity loan.[8] After identifying all individuals in the car and hearing RACI's account of the source of the money, agents returned the money to RACI and the vehicle was allowed to proceed. CW4 later informed agents that they had missed approximately $12,000 which Guajardo had also received from Ceballos.

q.  On February 14, 2005, at approximately 6:16 p.m., Target Phone 4 called 630-886-0522, and RACI spoke with ESTRADA. RACI told ESTRADA that he had "something" for him and asked whether he should "bring it now." ESTRADA asked, "how old is the girl?" RACI said, "21." ESTRADA then asked how old the "other girl" was that they were "supposed to get?" RACI said that she was "older than that." They discussed meeting. I understand that RACI was confirming to ESTRADA that he had the $21,000 discussed in the telephone call between Guajardo and ESTRADA discussed above.

---

[8]  RACI's mother arrived on the scene at one point and told agents that the money was from an income tax return.

r. On February 14, 2005, at approximately 6:41 p.m., Target Phone 4 called 630-886-0522, and Guajardo spoke with ESTRADA. Guajardo told ESTRADA his location and told him to call his brother and "come out."

### 5. Conversations Involving ZEF RACI, Guajardo and Individual E and seizure of $1,400 from Individual E

39. On February 12, 2005, at approximately 1:56 p.m., Target Phone 4 called Individual E. ZEF RACI, using Guajardo's phone, spoke to Individual E. RACI asked Individual E if he could "roll through." Individual E asked what RACI was talking about. RACI said he wanted "one half ozilla." Individual E agreed to meet in twenty minutes. I understand that RACI sought to purchase a quantity of narcotics from Individual E, and Individual E agreed to meet in order to do so.

40. On February 13, 2005, at approximately 6:33 p.m., Target Phone 4 called 773-828-1595, and Guajardo spoke with Individual E. Guajardo asked, "what is the business, can we holler at you tonight?" Individual E told Guajardo to give him a "holler," but Individual E said he only had "a half-piece left of the shit." I understand that Guajardo was inquiring about obtaining narcotics from Individual E later in the evening and Individual E responded that he was available but only had a small quantity of narcotics left to distribute to Guajardo.

41. On February 17, 2005, at approximately 4:05 p.m., Target Phone 4 received an incoming call from 773-828-1595, used by Individual E. He told Guajardo that he

39

"should have" some "real fire [narcotics] in about an hour." Individual E told Guajardo that he would call him in an hour or so.

42.     On February 17, 2005, at approximately 7:50 p.m., Target Phone 4 received an incoming call from 773-828-1595. Individual E told Guajardo that he had run into "some killer killer [narcotics]." Individual E then said he had a "half piece [quantity of narcotics]." They made arrangements to meet near RACI's house. I understand that Individual E was offering to distribute a quantity of narcotics to Guajardo and they agreed to meet near RACI's house.

43.     On February 17, 2005, at approximately 8:19 p.m., Target Phone 4 received an incoming call from 773-828-1595. Guajardo told Individual E to come by.

44.     On February 17, 2005, at approximately 8:35 p.m., Target Phone 4 called 773-828-1595. Guajardo told Individual E to "come on in."

45.     On February 17, 2005, at approximately 8:50 p.m., undercover ATF agents conducting mobile surveillance of Individual E stopped the vehicle in which he was driving at a location near 6200 West Archer Avenue, Chicago, Illinois. Prior to the stop, agents had intercepted several telephone calls, described more fully above, in which Guajardo and Individual E arranged a narcotics related transaction. Agents had further observed Individual E travel to RACI's house in Justice, Illinois a short time before stopping him. Individual E provided a valid drivers' license. The photograph on the license matched with the individual stopped by ATF. Agents performed a protective pat-down search of Individual E and found a bulge in one of his pants' pockets. The

40

undercover ATF agent asked Individual E to remove the item from his pants' pocket. Individual E produced a bundle of United States currency which was rubber-banded together. Individual E did not make any statement regarding the United States currency that was recovered. Agents retrieved the currency, which they later counted as $1,400. Individual E was then permitted to return to his vehicle and depart the area.

46. On February 17, 2005, at approximately 10:28 p.m., Target Phone 4 received an incoming call from 773-828-1595. Individual E spoke to Guajardo and told him that he had been "jacked on Archer by three narcs and they took $1,500 bucks from me." Individual E told Guajardo that he got the "plates" and went to a police station to make a report. Individual E again told Guajardo that he had a "plate number". He asked Guajardo, "can you do something for me." Guajardo said, "yeah." Guajardo then got the plate number from Individual E.

47. On February 17, 2005, at approximately 10:30 p.m., Target Phone 4 called 773-828-1595, and RACI talked with Individual E. He told RACI about the stop, and RACI asked for the license plate and description of the car that took his money. Individual E said that the vehicle was a "crown vic". Individual E told RACI that he went to a local police station to make a report but the police officer at the station told Individual E he could not make a report because they were "ATF officers." RACI ended the conversation by telling him he would get back to Individual E "tomorrow" regarding the "plate" that Individual E gave.

48.     On February 18, 2005, at approximately 7:51 p.m., Target Phone 4 received an incoming call from 773-828-1595. RACI had a conversation with Individual E, who told RACI that he went back to the police station to fill out a report. Individual E told RACI that a "lady at the desk" told Individual E that the police, not ATF, stopped him. Individual E told RACI he had to find out because "somebody is lying." Individual E then told RACI that he was "starving" and "hurting." Guajardo then came on the phone and told Individual E that he and RACI were driving around. Individual E told Guajardo that he had a "four piece [narcotics]" he was "trying to get off of [trying to sell]." Guajardo said "maybe" he would "take one." Individual E then said that he was trying to "recoup" his "losses." Guajardo said he would call Individual E back. I understand that Individual E was trying to sell a quantity of narcotics in an effort to generate funds to replace the $1,400 that had been taken from him by ATF agents. I further understand that Guajardo indicated that he might take some of the narcotics from Individual E.

49.     On February 18, 2005, at approximately 8:15 p.m., Target Phone 4 called 773-828-1595 and Guajardo spoke with Individual E. Guajardo asked Individual E if he had the "fire fire [narcotics]" like yesterday "or better." Individual E said he had the "cheaper one . . . the good to good but it ain't that expensive good." Individual E said that it was "the usual one, it is real nice." Guajardo and Individual E agreed to meet.

50.     On February 18, 2005, at approximately 8:41 p.m., Target Phone 4 called 773-828-1595 and Guajardo spoke with Individual E. Guajardo asked Individual E

where he was. Individual E gave his location and said he would see Guajardo in "five minutes."

51. On February 18, 2005, at approximately 9:24 p.m., Target Phone 4 received a call from 773-828-1595. Individual E spoke with Guajardo. The call occurred shortly after the vehicle in which Individual E was traveling had been stopped by local law enforcement officials working in conjunction with ATF. At the time of the stop, agents had reason to believe based on intercepted telephone conversations referenced above between Individual E and Guajardo that Individual E had narcotics on him that he was trying to sell. Agents further had reason to believe that Individual E was on his way to meet Guajardo so that Guajardo could sell a quantity of narcotics to Individual E. Agents expected to retrieve the narcotics Individual E intended to supply to Guajardo. A drug dog was called to the scene, but it did not alert on narcotics. Individual E was then released. Individual E told Guajardo the police stopped him and they used "a dog." Individual E said he was "scared" when they "brought out the dog," but the dog "was stupid and didn't find anything." Individual E then told Guajardo to meet him "at the gate" at the entrance to Guajardo's trailer park. Guajardo agreed. I understand that Individual E was explaining to Guajardo that he had been stopped by police but a drug dog failed to find narcotics that Individual E had in his possession.

43

**6.** **Miscellaneous Phone Calls Involving SZAJEK, RACI, and Guajardo Regarding Narcotics.**

52.     On October 8, 2004, at approximately 11:00 p.m., Target Phone 4 received an incoming call from phone number 815-530-7865. The voice of SZAJEK is recognized as using Target Phone 4. During the call, an unidentified male asked SZAJEK if he (SZAJEK) was going to "spot" him or should he "stick around" and "wait" for his money. In the background, SZAJEK asked Guajardo, "should he bring his money or will you (Guajardo) give it to him." SZAJEK then told the unidentified male, "bring a little somethin' and get a little somethin'." The unidentified male responded that if he was going to have to bring something then he would have to wait until 3:00. SZAJEK replied that they would double whatever the unidentified male brought. The unidentified male told SZAJEK that he could give it to him and then asked to speak to Guajardo. After Guajardo picked up the phone, the unidentified male asked Guajardo if he was "going to hook it up or what?" Guajardo responded, "yeah, whatever you want." The unidentified male then asked Guajardo, "one or two?" Guajardo instructed the unidentified male to come through and then asked whether the unidentified male was "going to bring the family?" The unidentified male responded that "whenever I travel dirty, I bring the family." Guajardo then said, "all right, come now. They'll be there." I understand that the unidentified male was arranging to purchase narcotics from Guajardo. I understand that Guajardo instructed the unidentified male to travel to his (Guajardo's) residence and to bring money. I further understand that the unidentified male would bring his family

44

along to pick up the narcotics. I am aware that some individuals bring family members (such as young children) with them when they are transporting narcotics in order to shield themselves from suspicion by law enforcement.

53. On February 14, 2005, at approximately 1:13 p.m., Target Phone 4 called 708-415-6099 and Guajardo had a conversation with RACI, who told Guajardo that he had gone to "dude's" house but that "dude" had not come to the door. Guajardo said that he was asking for a "30 piece." Guajardo then told RACI that he was going to "go to the other nigga's house." Guajardo hung up with RACI and answered call waiting. I understand that when Guajardo was speaking to RACI about a "30 piece", he was discussing the need to obtain a particular quantity of narcotics.

54. On February 15, 2005, at approximately 11:03 p.m., Target Phone 4 called 708-699-6388 and spoke to an unknown male. Guajardo told the unknown male that he was supposed to be working "to get some fire [narcotics]." The unknown male said that he would call back in a half hour. RACI then got on the phone and asked the unknown male if he had any "OZ [a type of narcotics]." The unknown male said, "naw, tomorrow."

**E.     Conversations Between CW4 and ESTRADA Regarding Future Distribution of Cocaine and Heroin.**

55. In June 2006, CW4 had a series of telephone conversations and meetings, most of which were consensually recorded by CW4, with ESTRADA to discuss the supply by ESTRADA of cocaine and heroin to CW4. Previously, ESTRADA had

45

supplied CW4 with large amounts of cocaine. CW4 and ESTRADA did not ultimately consummate a transaction, I believe because ESTRADA thought he was being followed by law enforcement after meeting with CW4.

56. On or about June 12, 2006, ESTRADA called CW4. The call was not recorded. According to CW4, ESTRADA told CW4 that ESTRADA planned to fly to Chicago on or about June 13, 2006, and wanted CW4 to pick up ESTRADA at O'Hare International Airport. ESTRADA gave CW4 flight information for a United flight from California. According to CW4, he/she asked ESTRADA during that phone call whether there was "good news," which I understand to mean that CW4 was asking ESTRADA whether ESTRADA had narcotics to supply to CW4. According to CW4, ESTRADA answered that there was good news. The next day, ESTRADA called CW4 again. In an unrecorded call, ESTRADA told CW4 that he was not going to fly to Chicago until the next day, June 14, 2006.

57. On June 13, 2006, while acting in an undercover capacity and in the presence of ATF agents, CW4 telephonically contacted ESTRADA. The call was recorded. During the undercover call, ESTRADA confirmed that he was arriving in Chicago on June 14, 2006. CW4 asked if ESTRADA could provide flight details. ESTRADA stated that the paperwork was at his house and he would re-contact CW4 later. CW4 asked if there was "good news". ESTRADA stated in part, "Yeah, yeah, good news." ESTRADA also stated in part, "Make sure 'head' is perfect, we're gonna hit you in the head. I'll be there and we'll talk about it."

46

58.     On June 14, 2006, CW4 met with ATF agents at a pre-determined location. At this time, CW4 and CW4's vehicle were searched for guns, drugs, and money with negative results. CW4 was then equipped with recording equipment and CW4's vehicle was equipped with audio and video equipment. ATF agents then gave CW4 $1,000 which was to be given to ESTRADA for his hotel stay in Chicago. Prior to departing the pre-determined location, the audio and video equipment was activated and CW4 departed the area enroute to O'Hare International Airport.

59.     On June 14, 2006, at approx 5:30 p.m., CW4 arrived at O'Hare International Airport and picked up ESTRADA and an unidentified male approximately 16 to 20 years old. CW4 drove ESTRADA and the unidentified Hispanic male to the Red Roof Inn located at 7535 Kingery Road, Willowbrook, Illinois. ESTRADA rented room #226. CW4 walked with ESTRADA to his room for a brief period and then took ESTRADA and the unidentified Hispanic Male to the Patio Restaurant located on 75th and Kingery Road.

60.     At the conclusion of the undercover meeting, CW4 met with ATF agents at a pre-determined location. ATF agents interviewed CW4 and then reviewed the recording between CW4 and ESTRADA. Based on the interview with CW4 and a review of the recording between CW4 and ESTRADA, the following is a non-verbatim discussion of what occurred during the meeting between CW4 and ESTRADA:

a.     ESTRADA told CW4 that he flew in from Orange County, California, specifically John Wayne Airport. ESTRADA then discussed selling heroin to

47

CW4. ESTRADA then told CW4 that it is very dangerous because it is "pure." ESTRADA told CW4 that CW4 can make more money selling:"China White" than "kilos" (kilos of cocaine). ESTRADA told CW4 that a majority of the cocaine ESTRADA had was going to Cleveland. ESTRADA tells CW4 that he has a truck located in California that has 70 kilos on it and he needs to find a driver.

b. ESTRADA askedd CW4 if he could "move" the heroin. CW4 stated that he could move it. ESTRADA told CW4 that CW4 could "cut" the kilo of heroin "five times" and make more money from one kilo. ESTRADA states in part, "one kilo, you can make $200,000." ESTRADA told CW4 that another individual named "Green Eyes" would show CW4 how to "break up" the kilogram of heroin.

c. ESTRADA asked CW4 what kind of "collateral" did CW4 have because it is "China White." ESTRADA asked CW4 if ESTRADA could borrow a car to use while staying in Chicago. CW4 told ESTRADA that CW4 would get him a car within the next day or so. ESTRADA asked for a mini van. He specifically requested that the car not be "flashy." CW4 gave ESTRADA $1,000 prior to arriving to the hotel.

d. Prior to departing the area, ESTRADA told CW4 that he needed the car (mini van) by tomorrow because he had to meet with "Green Eyes." ESTRADA also told CW4 that when "Green Eyes" arrives, Green Eyes will want to meet with CW4 to go over the details. CW4 agreed. At the conclusion of the meeting, CW4 stated in part, "bottom line, I gotta pay you the 75 ($75,000 per kilogram of heroin)." ESTRADA agreed.

61. On June 15, 2006, CW4 placed a recorded call to ESTRADA. CW4 informed ESTRADA that CW4 had a "a red Mini Van for the first thing tomorrow morning, I'm going to pick it up." They agreed that CW4 would pick up ESTRADA at the Red Roof Inn on June 16, 2006. CW4 reiterated that CW4 obtained a red Mini Van and stated in part, "the other car, whenever we need, it will be ready, the working car." The call was terminated.

62. On June 16, 2006, CW4 met with ATF agents at a predetermined location. CW4 was searched for guns, drugs, and money with negative results and was provided recording equipment. CW4 was also provided a Ford Freestar Mini-van which was equipped with a tracking device. CW4 then traveled to the Red Roof Inn located in Willowbrook, Illinois to meet with ESTRADA. The purpose of the meet was for CW4 to give the Ford Freestar Minivan to ESTRADA for his personal use while ESTRADA was in Chicago trafficking narcotics.

63. On June 16, 2006, this date, at approximately 8:51 a.m., while under ATF surveillance, CW4 arrived at the Red Roof Inn and met with ESTRADA. ESTRADA entered the vehicle. CW4 then exited the Red Roof Inn parking lot. ATF surveillance units then observed CW4 drive back to his/her residence. At approximately 9:18 a.m., ATF surveillance observed ESTRADA depart the CW4's residence and travel back to the Red Roof Inn. Agents then debriefed CW4 and review the tape of their meeting. The following is a summary of what occurred based on that debriefing and the review of the tape:

49

a.  ESTRADA asked CW4 if CW4 was "ready". CW4 told ESTRADA, "Yeah, we're ready." ESTRADA asked CW4 "how many" CW4 wanted. CW4 said, "I can do whatever." ESTRADA again asked, "How many can you take right away." CW4 responded, "I don't know right away, Primo. What do you want me to do? You tell me what you want me to do."

b.  ESTRADA told CW4 that if CW4 brought "Pesos [money], then [CW4] could take that one [kilogram of heroin] and make it into six and then sell them and make the money." ESTRADA told CW4 that "Green Eyes" would teach CW4 how to break the kilogram of heroin.

c.  CW4 told ESTRADA that he had "wished they had kilos [of cocaine] instead of this [heroin]," but he would do whatever ESTRADA wanted CW4 to do. CW4 told ESTRADA that CW4 could "traffic [handle]" whatever amount they give him. CW4 then asked how long CW4 would have to pay back ESTRADA. ESTRADA stated that he was going to meet with the "Patron" (boss) later today and that he needed to tell the "Patron" "how many" (kilograms) CW4 wanted. CW4 stated that he/she could move whatever "Green eyes" wants to get rid of, but CW4 needed to know how long he will be given to sell the kilograms. CW4 and ESTRADA then discussed arrangements for delivery. ESTRADA asked CW4 if CW4 could bring some money instead of having the kilos "fronted". ESTRADA requested that CW4 find out how fast CW4 could sell the heroin and then come back to purchase more. CW4 told Estrada stated in part, "we've played softball and now you want us to play baseball. It the same game but it is different,

50

you know what I mean." CW4 stated that he "was barely getting $19,500 from the guys for kilos of cocaine and now you (ESTRADA) want me (CW4) to get 80 ($80,000)."

d.      ESTRADA and CW4 agreed that ESTRADA would meet with "Green Eyes" in order to get further direction and they would then meet again to consummate their deal.

64.      After ESTRADA met with CW4, ESTRADA drove the van with a tracker device throughout the Northern District of Illinois into Wisconsin. ESTRADA and CW4 did not meet again because, as he explained to CW4 in a later telephone call, ESTRADA feared that the police were watching him.

## IV.    CONCLUSION

65.    WHEREFORE, Affiant submits that the foregoing evidence establishes that the above listed defendants conspired and agreed with others known and unknown, to possess with intent to distribute and distribute a controlled substance, namely, in excess of five kilograms of cocaine and amounts of marijuana, in violation of Title 21, United States Code, Section 846.

FURTHER AFFIANT SAYETH NOT.

_____
MICHAEL G. CASEY
Supervisory Special Agent, ATF

SUBSCRIBED AND SWORN TO BEFORE
ME THIS 4th DAY OF DECEMBER, 2006.

_____
MARIA VALDEZ
UNITED STATES MAGISTRATE JUDGE

52